# JUNE, 1930

STATE OF TEXAS ET AL. V. J. T. ROBISON, COMMISSIONER OF GENERAL LAND OFFICE, ET AL.

No. 5376.   Decided June 18, 1930.
(30 S. W., 2d Series, 292.)

*Claude Pollard,* Attorney General and *C. W. Trueheart,* Assistant, for appellant.

The Commissioner or Chief Clerk of the General Land Office never having opened, examined or considered, with a view to determining the highest bid, competitive applications to purchase oil and gas leases on "Schedule B Land" under Article 5343, and none of interveners having been ascertained to be the highest bidder, there had been on January 11, 1929, no acceptance by the State's agent consummating a contract of sale, vesting property rights in interveners, which could prevent the State on the latter date from revoking its agent's authority to sell without impairing the obligation of contracts or depriving interveners of property, in violation of Subdivision 1, Section 10, Article 1, U. S. Constitution, Section 16, Article 1, State Constitution, Section 1, Article 14, Amendments of U. S. Constitution, Section 17, Article 1, State Constitution or Section 19, Article 1, State Constitution. Coleman v. Lord, 72 Texas, 288; Campbell v. Blanchard, 2 Posey (U. C.) 321; Campbell v. Wade, 132 U. S., 34.

Interveners by delivering their bids into the Land Office on December 28th did not, under Article 5343, in view of the preliminary

injunction of January 1st prohibiting defendants from selling leases or opening applications on January 2nd or thereafter, fix such "right" or "privilege" in themselves to have all bids opened and considered with respect to "Schedule B Land" as is protected by the prohibition against retroactive laws (Section 16, Article 1, State Constitution) or laws in deprivation of privileges as citizens of the State (Section 19, Article 1), preventing a legislative withdrawal of such land from the market. Mellinger v. City of Houston, 68 Texas, 37; DeCordova v. City of Galveston, 4 Texas, 470, 475; Turbeville v. Gowdy, 272 S. W., 559, 562; Keith v. Guedry, 114 S. W., 392, 396; Welhausen v. Terrell, 100 Texas, 150; Ward v. Billups, 76 Texas, 466.

Section 2 of Article 5343 provides: "Sales of oil and gas leases on the lands included herein shall be made by the Commissioner of the General Land Office not less than once each month, when there is land in demand, and at ten o'clock A. M. *on the day fixed therefor:*" Thus, as already ruled, "the Land Commissioner is mandatorily required to sell oil or gas in University land upon receipt of a request to place same on sale." Theisen v. Robison, 8 S. W., (2nd) 652.

Whenever a duty or power is conferred by statute upon a public officer, all necessary authority to make such power fully efficacious, or to render the performance of such duty effectual, is conferred by implication. State v. Hackmann, 207 S. W., (Mo.) 64.

It is a well established doctrine of the law that the power of public sale, under either foreclosure or execution, vests in the officer in charge as incident thereto, the power to adjourn the sale or postpone the sale as the exigencies of the situation demand. Note, 97 Am. St. R., 653; Note, 26 Am. Dec., 536.

*Cal. Estill* and *Hart, Patterson & Hart,* for Brown and Campbell.

The effect of the University land lease Act of 1925 which conferred on the Land Commissioner the power to adopt such rules and regulations "as may be necessary to the proper execution of its purposes" was to give to him the power to perfect the machinery essential or convenient in the administration of the Act and the effectuation of its manifest purpose to bring about the sale of the leases; but not to substitute his will that the lands be not sold in the place at the Legislative will that they be sold. Thieson v. Robison, 8 S. W., (2nd) 646; Day Co. v. State, 68 Texas, 526; N. Y. etc., Co. v. Thomson, 83 Texas, 169, 181; Hanrick v. Cavanaugh, 60 Texas, 1,

24; Gaither v. Hanrick, 69 Texas, 97; State v. Post, 169 S. W., 410; Railway Co. v. State, 37 S. W., 116; Weaver v. Robison, 268 S. W., 141; Garfield v. Goldsby, 211 U. S., 249; Sanford v. Terrell, 87 S. W., 655; Mitchell v. Thomas, 172 S. W., 715; Sherrod v. Terrell, 97 Texas, 165; Island City Savings Bank v. Dowlearn, 94 Texas, 383; Marshall v. Robison, 109 Texas, 15; Foster v. Waco, 113 Texas, 352; Ketner v. Rogan, 95 Texas, 559; Smisson v. State, 71 Texas, 222; Estes v. Terrell, 99 Texas, 622; Monongahela Bridge Co., v. U. S., 216 U. S., 177; United States v. Pennsylvania Co., 235 Fed., 961; Union Bridge Co. v. United States, 204 U. S., 364; Field v. Clark, 143 U. S., 649, 693; 25 R. C. L., p. 690, 963, 959, 981; United States v. Union Pacific, 91 U. S., 72; Schuyler v. Thomas, 95 U. S., 169; Durousseau v. United States, 6 Cranch, 307; Ex parte McCardle, 7 Wall. 506; Bank v. Peters, 144 U. S., 507.

A further and decisive reply to the contention and the Attorney General that the Land Commissioner had the power of postponement is found in the decision of this Court in the case of Estes v. Terrell, 99 Texas, 622, 92 S. W., 407. The Legislature stipulated that when there was a tie between the highest bidders, all bids should be rejected, "and a date fixed within the discretion of the Commissioner, but not more than 15 days after rejection when a lease of the land will be subject to sale as in the first instance." This specification of the Commissioner's power to postpone the sale under the limited conditions particularly stated, coupled as it is with the total failure to confer like power on him under any other conditions, is inescapable evidence that the Legislature not only had in mind the question of postponement of the sale by the Commissioner, but that it intended that the sale should not be postponed under any conditions other than those stipulated.

It is an equally well established rule of statutory construction "that the mention of one thing implies the exclusion of another thing; expressio unis est exclusio alterius." (25 R. C. L. p. 981.) An affirmative designation of instances in which a power may be exercised implies a negative on the exercise of such power in other cases. Durousseau v. United States, 6 Cranch, 307; Ex parte McCardle, 7 Wall., 506; National Exchange Bank v. Peters, 144 U. S., 570.

The numerous verbal requests received by the Land Commissioner to place on sale all of the mineral leases were sufficient to create the demand for these leases contemplated by this statute. Thieson v. Robison (Sup.) 8 S. W., (2d) 646; Field v. Clark, 143 U. S., 649;

Trinity County v. Mendocino County, 151 Cal., 279, 90 Pac., 285; Walck v. Murray, 18 Okla., 612, 91 Pac., 238; Union Bridge Co. v. United States, 204 U. S., 364; Jackson v. Whiting, 84 Miss., 163, 36 So., 611; Schaake v. Dolley, 85 Kan., 598, 118 Pac., 80; Ellwell v. Comstock, 99 Minn., 261, 109 N. W., 113.

It is proper for the Legislature to make the operation of its enactment dependent upon the determination by an executive officer of the location of a boundary between two counties (Trinity County v. Mendocino County, 151 Cal., 279, 90 Pac., 285); whether the Constitution of a new State is republican in form (Walck v. Murray, 18 Okla., 612, 91 Pac., 238); the existence of the conditions of reciprocity entitling foreigners to the benefit of copyright laws; whether the laws of a foreign country discriminate against the importation of American goods (Field v. Clark, 143 U. S., 649); whether a bridge over a navigable stream constitutes an unreasonable obstruction to navigation (Union Bridge Company v. United States, 204 U. S., 364); whether a petition for the incorporation of a municipality has been signed and published as required by law (Jackson v. Whiting, 84 Miss., 163, 36 So., 611); whether there is a public necessity for the establishment of a bank in a particular community (Schaake v. Dolley, 85 Kan., 598, 118 Pac., 80); whether a voting machine to be used at elections is efficient (Ellwell v. Comstock, 99 Minn., 261 109 N. W., 113).

*Phillips, Trammell, Chizum & Price,* and *White, Wilcox and Taylor,* for Gibson, Johnson and Renaud.

The State, through the enactment of Chapter 71, Acts of 1925, and through the advertisement of the Commissioner of the General Land Office (he having ascertained that Schedule B land was in demand) that oil and gas leases upon said lands would be sold on January 2, 1929, to the applicant paying the most therefor, offered for sale to the highest bidder leases on said lands; and the highest bidder, that is the applicant who paid the most for any tract of Schedule B land (his application being in all things legal and in conformity with said Act) thereby accepted the offer so made and a contract was thereby made which could not be and was not impaired by the Act of January 11, 1929. U. S. Constitution, Article 1, Section 10; Texas Constitution, Article 1, Section 16; White v. Martin, 66 Texas, 340; Jumbo Cattle Co. v. Bacon & Graves, 79 Texas, 5; Harper v. Terrell, 96 Texas, 479, 73 S. W., 949; Ford v. Brown, 96 Texas, 543; Tillman v. Erp, 121 S. W., 547; Keith v. Guedry, 114 S. W., 393; Weber v. Rogan, 94 Texas, 62; Cooley's Constitutional Limitations,

8th Ed., page 582–583, et seq.; Theison v. Robison, 8 S. W., (2nd) 652; Johnson v. Smith, 246 S. W., 1013 (Tex. Sup.).

The highest bidder for any tract of Schedule B lands (he having complied with all of the provisions of Chapter 71, Acts of 1925, and the regulations adopted by the Land Commissioner) acquired a vested right in such lands which could not be and was not divested by the Act of January 11, 1929. Same authorities; Section 1, Article 14, Amendments to United States Constitution; Section 19, Article 1, Texas Constitution; Snider v. Methvin, 60 Texas, 487; Marshall v. Robison, 109 Texas, 15, 191 S. W., 1136; Houston Oil Co. v. McGrew, 107 Texas, 220, 176 S. W., 45; Fitzhugh v. Johnson, 105 Texas, 318; Rawls v. Terrell, 101 Texas, 157; State v. Bridges, 22 Washington, 66, 79 Am. St. Reports, 915, 60 Pac. 61; State v. Houston Oil Co., 194 S. W., 422–434; 21 C. J., p. 200 et seq., Pomeroy, Equity Jurisprudence, 3rd Ed. Secs. 365, 368.

The highest bidder for Schedule B lands, even though on January 2, he may not have acquired a vested property right in the land itself, yet, he acquired a vested right to become the purchaser of such lands and a vested right in any remedy then available which was necessary to enable him to fully consummate such purchase. Art. 1, Sec. 13, State Constitution; Mellinger v. City of Houston, 68 Texas, 37, 3 S. W., 249; G. C. & S. F. R. R. Co. v. Fuller, 63 Texas, 467; Cooley's Constitutional Limitations, 8th Ed., pages 557–558, 592, and 756; 6 R. C. L., Section 314 et seq., p. 325; Rosenberg v. Bump, 185 Pac., 218–226; 21 C. J. 184.

After ten o'clock on January 2, 1929, any applicant for Schedule B lands had the right under the laws then in force to compel the Commissioner of the General Land Office by mandamus to open the envelopes containing the bids and to ascertain the highest bid and to issue a lease to the applicant who paid the most for any area advertised for sale on that date. Hogue v. Baker, 92 Texas, 58, 45 S. W., 1004; Nelson v. Edwards, 55 Texas, 389; Teat v. McGaughey, 85 Texas, 478, 22 S. W., 302; Laidlaw Bros. v. Marrs, 273 S. W., 789.

Under the Act of 1925 it is the mandatory duty of the Land Commissioner upon proper demand for the advertisement and sale of leases on University lands to make such sales on a competitive basis. He has no discretion in the matter, but must proceed with such sales upon proper demand. Theison v. Robison, 8 S. W., (2d) 646; Marshall v. Robison, 191 S. W., 1136.

These Interveners had filed their bids prior to January 2, 1929, in good faith and in response to the advertisement of the State, and

thereby acquired the right to have their bids, and all other bids filed on such lands, opened for the ascertainment for the highest bids, and having acquired such valuable right, the Legislature had no power to prevent the opening and consideration of such bids for the reason that Section 16, Article 1 of the State Constitution forbids such retroactive legislation.. Mellinger v. City of Houston, 3 S. W., 249; Galveston, etc., v. Mallet, 6 S. W., (2d) 435; Galveston, etc., v. Wursbach, 189 S. W., 1006; McCutcheon v. Smith, 194 S. W., 831; Greenwood v. Furr, 251 S. W., 337; Coffee v. Castleberry, 258 S. W., 892; I. & G. N. Ry. Co. v. Edmunson, 222 S. W., 185.

*James & Conner* and *Ocie Speer* and also *W. P. Z. German, Alvin F. Malony, Geo. W. Cunningham* and *Robert M. Turpin* by leave of the court, filed briefs and arguments upon the questions certified, as amici curiae.

MR. JUSTICE PIERSON delivered the opinion of the court.

This case is before us on certified questions from the Honorable Court of Civil Appeals for the Third District. For a full understanding of the case we deem it advisable to quote the entire certificate, which is as follows:

"The above styled and numbered cause is pending in this court on appeal from the 53rd Judicial District Court of Travis County. The questions herein certified are material to a decision of the appeal and grow out of the nature and result of the suit and the facts disclosed by the record before us, which, in so far as deemed material to this certificate, are:

"The parties (designated as in the court below):

"Plaintiffs: The State of Texas and the Board of Regents of the University of Texas.

"Defendants: J. T. Robison and J. H. Walker, Commissioner and Chief Clerk, respectively, of the General Land Office.

"Interveners: H. F. Gibson, F. Kirk Johnson, and Charles Renaud; and H. L. Brown and Frank K. Campbell, Jr.

"'The appeal involves the validity of the act of the Land Commissioner under Chapter 71 Acts of Regular Session of the 39th Legislature, in postponing from January 2, 1929, to January 22, 1929, the sale of oil and gas leases on certain University lands, designated 'Schedule A Land'; the sufficiency of the demand for 'Schedule A Land' to render it subject to lease; and the constitutionality of the Act of the 41st Legislature (repealing Chapter 71 of the Regular

Session of the 39th Legislature), known as Senate Bill No. 7, approved and effective January 11, 1929, as applied both to 'Schedule A Land' and also to 'Schedule B Land', the latter being the land set for sale January 2, 1929, the sale of which was not postponed by the Land Commissioner.

"The cause is brought to this court upon an agreed statement of the pleadings, evidence, contentions of the parties, and questions involved, as provided in Revised Statutes, Art. 2280, a practice which we think should receive commendation and encouragement from the appellate courts.

"The evidence which we think pertinent to a proper answer to the questions certified follows:

" 'During the summer and fall of 1928 and up to November 10, 1928, the Land Commissioner had many requests made of him by many persons that oil and gas leases of all University lands generally, be placed on sale under Chapter 71 of the Acts of 1925 (R. S., Art. 5343), which requests were determined by him to render such land "in demand" as provided in said act, and the Land Commissioner, in good faith believed it to be his mandatory duty to place such oil and gas leases on sale."

"About November 1, 1928, interveners Gibson, Johnson and Renaud filed an application with the Land Commissioner, asking that oil and gas leases on 'Schedule B Land' be placed on sale, the tracts of land being specifically designated therein. This demand was thereafter renewed by letter of November 17, 1928, again during the months of November and December, up to December 15, 1928. The Land Commissioner, in good faith, determined that such demand by said interveners rendered the land so designated to be "in demand," and that it was his mandatory duty to place oil and gas leases thereon on sale.

"On November 10, 1929, the Land Commissioner, acting under the provisions of Sec. 3 of said Act, prepared and delivered to the Board of Control for printing lists of all University lands, including both 'Schedule A Land' and 'Schedule B Land,' which contained a brief description of the tracts to be subject to lease, the terms upon which they would be leased, the time when applications would be filed and opened in the Land Office, and such rules and regulations adopted by the Land Commissioner as he deemed necessary in the premises. The lists were printed and returned to the Land Office not later than December 7, 1928. A large number of the lists were at once displayed and so kept continuously in a public place in the Land Office for free distribution; copies for

distribution were mailed to every person, firm, or corporation upon the mailing list of the Land Office, which contained several hundred names, including those believed by the Commissioner to be interested in the purchase of oil and gas leases; and copies were also mailed to County Clerks, County Judges and banks, and were mailed and/or delivered to every person making request. The Land Commissioner did not have sufficient means for giving the necessary publicity of the sales other than through these printed lists, but publicity was also given as news items in newspapers of general circulation that University lands generally were being placed on sale.

"The date fixed in these lists for the sale of lands, both in Schedule A and Schedule B, was January 2, 1929, at 10 o'clock a. m. The remaining lands in the lists were advertised for sale at 10 o'clock a. m. on days ranging from January 16, 1929, to January 31, 1929.

"On December 28, 1928, interveners Gibson, Johnson and Renaud, who had theretofore incurred substantial expense with a view to bidding thereon, delivered to the Land Commissioner at his office separate bids covering each tract included in 'Schedule B Land,' except fractional sections 1, 2, and 3 in Block 16, Ward County. These bids were kept by the Commissioner in his office and were on file at 10 o'clock a. m. on January 2, 1929. They complied in every respect with the provisions of Chapter 71, Acts of 1925, and the rules and regulations of the Land Commissioner, and were accompanied by certified checks in amount more than the minimum prescribed by law, including the required fees, the amounts deposited by Gibson and Johnson aggregating $746,391.00; and those deposited by Renaud aggregating $102,189.00. At 10 o'clock a. m., January 2, 1929, interveners Brown and Campbell had on file in the General Land Office separate bids covering all tracts in both 'Schedule A Land' and 'Schedule B Land.' These bids also complied in every respect as to deposit and otherwise with Chapter 71, Acts of 1925, and with the rules and regulations made by the Commissioner. Prior to 10 o'clock a. m., January 2, 1929, a great many other persons, firms and corporations delivered into the Land Office and left for filing with the Land Commissioner sealed bids covering all lands included in 'Schedule A Land' and 'Schedule B Land,' which bids were on file at 10 o'clock a. m., January 2, 1929.

"On December 31, 1929, both through the press and through lists prepared for such purpose and available for distribution at the General Land Office, the Land Commissioner, while doubting his right so to do, but in deference to an opinion of the Attorney General,

officially announced a postponement from January 2nd to January 22nd, 1929, of the sale of all of the lands listed and designated as 'Schedule A Land.' The Commissioner did not, by the rules and regulations adopted by him pertaining to the sale of said leases, reserve the right to postpone the sale of any of the leases advertised by him for sale.

"None of the applications on file on January 2, 1929, or thereafter, was opened or examined by the defendants, except that at ten o'clock a. m. on said date the Land Commissioner opened several envelopes containing bids on 'Schedule A Land' and rejected same for the reason that he had undertaken to postpone the sale of such lands. Had it not been for the restraint of the temporary injunction the defendants would on January 2, 1929, have opened the bids on 'Schedule B Land' and awarded oil and gas leases to the highest bidder for such respective tracts.

"This suit was brought by the plaintiffs against the defendants on January 1, 1929, for the purpose of securing both a temporary and permanent injunction specifically restraining the defendants, and each of them, in their official capacity, 'from selling oil and/or gas, and oil and/or gas leases on or in' the lands designated as 'Schedule B Land,' and from opening the envelopes containing the applications, or considering applications to buy any of the oil and gas leases on lands both in Schedule A and Schedule B advertised for sale January 2, 1929.

"The grounds for the relief sought were:

"1. That there had been no specific demand made for any of the oil and gas leases advertised for sale.

"2. That there had not been sufficient advertisement.

"3. That the Land Commissioner had the power to postpone the sale to some later date in the month of January and had abused his discretion in fixing January 2, 1929, as the sale date.

"The trial court ex parte and without hearing, on January 1, 1929, granted a temporary injunction as prayed for, and writs were forthwith served on the defendants.

"January 17, 1929, plaintiffs by trial amendment set up the above act of January 11, 1929, and prayed for an injunction restraining defendants from selling or making oil or gas leases on any of the University lands, including both Schedule A and Schedule B lands advertised for sale on January 2, 1929, and those advertised for a later date, this prayer being made appropriate to each and every tract.

"Interveners by appropriate pleading urged:

" 'That the Act of January 11th, 1929, is unconstitutional and ineffective as concerns their bids, for the reasons that their rights had theretofore become fixed, and vested, and because said Act as affecting their applications was retroactive and would destroy vested rights without due process of law and without compensation, and would impair obligations of contracts, all in violation of Subdivision 1 of Section 10, Art. 1, of the Constitution of the United States, Section 1 of Article 14 of the amendment of said Constitution, Section 16 of Article 1 of the Bill of Rights of the State of Texas, Section 17 of Article 1 of the State Constitution and Section 19 of Article 1 of said Constitution."

"They also sought (1) dissolution of the temporary injunction; (2) denial of permanent injunction sought by plaintiffs; and (3) the injunctive relief granted them in the judgment as noted below.

"The trial court rendered final judgment: (a) dissolving plaintiffs' temporary injunction; (b) granting plaintiffs' permanent injunction, restraining defendants from selling or making oil or gas leases on 'Schedule A Land'; (c) otherwise denying plaintiffs' injunction as asked; (d) granting interveners' injunction restraining defendants from returning, destroying or removing applications or money for 'Schedule B Land' until the highest bids have been ascertained; and from returning the highest bids when ascertained; (e) denying interveners Brown and Campbell injunction affecting 'Schedule A Land'; (f) adjudging all costs against plaintiffs; (g) pending appeal of plaintiffs enjoining defendants from undertaking to issue oil and gas leases on the tracts of land in connection with which judgment was awarded interveners; (h) pending appeal of interveners, Brown and Campbell, according temporary injunctive relief in order to preserve the status quo.

"From this judgment plaintiffs and interveners Brown and Campbell have separately appealed.

"The parties have filed a joint motion to certify the questions involved in the appeal, which motion accompanies this certificate.

"Because of the public importance of the controversy thus raised, and the manifest urgent necessity of having a judicial determination thereof by the Supreme Court as soon as practicable, we deem it advisable and our duty to certify for your decision the questions set forth in the agreed case, which are the following:

" '1. Is Section 3 of the Act of January 11, 1929, or said act in its entirety, as affecting 'Schedule B Land,' unconstitutional and void upon the grounds alleged by interveners?

" '2. Did the Commissioner have the power under Chapter 71 of the Act of 1925, to postpone, as on December 31, 1928, he undertook to do, any of the sales of oil and gas leases in University lands which he had previously fixed for January 2, 1929?

" '3. Were the many requests made of the Commissioner prior to November 10, 1928, that all University lands generally be placed on sale, such requests having been determined by the Commissioner to render said lands "in demand," sufficient to render such lands "in demand," within the terms of Chapter 71 of the Act of 1925?'

"Question 1 is the only question involved in plaintiffs' appeal; and Questions 2 and 3 are the only questions involved in the appeal of interveners Brown and Campbell; Question 3, decided by the trial court in favor of said interveners, being raised by plaintiffs' cross assignment of error."

Chapter 71, Acts 1925, R. S., Article 5343, of course controls the disposition of this case.

If a contract of purchase or a right to purchase an oil and gas lease on any tract of land vested in any of the interveners under the terms of said statute, that contract or that right of course would be protected by the statute and by the Constitutions of the United States and of Texas.

Hon. J. D. Moore, sitting as Judge of the Fifty-third Judicial District, entered judgment in favor of all interveners, H. F. Gibson, F. Kirk Johnson, Charles Renaud, and H. L. Brown and Frank K. Campbell, Jr., regarding leases on lands embraced in Schedule B. His decision was founded on the admitted facts that proper and ample "demand" was made under the statute that these lands be placed on sale; that leases on said lands were placed on sale by the Commissioner in all respects as required by the statutes, and January 2, 1929, at 10 o'clock a. m. was set by the Commissioner as the time when bids would be opened and the sales completed under the terms of the statute, and that these interveners, together with many others, had filed proper bids, deposits, etc., in all things as required by law, and that nothing remained to be done to complete and effect the sales, except the opening of the bids and the ascertaining of the highest bidder on each tract by the Commissioner. The court entered judgment against interveners Brown and Campbell as to the sale of leases on all lands embraced in Schedule A.

We presume from agreed facts stated in the certificate of the Court of Civil Appeals that the trial court found against the bids and sale of leases on Schedule A lands because the facts showed

no sufficient or legal "demand" as contemplated by the statute, and therefore these lands were not offered for sale.

The judgment of the trial court is undoubtedly correct.

For the purpose of carrying out the mandate of the Constitution that the public lands be sold, in 1925 the Legislature enacted Chapter 71, which made provision for the sale of oil and gas leases on University lands. This Act, Chapter 71, Acts of 1925, is not difficult of construction. Its language is unambiguous, and with one or two exceptions its meaning is simple and plain. At least it makes clear the effect of a complete compliance with its provisions to effect a sale of oil and gas leases on these lands, which is the declared purpose of the Act.

Through the Act the State informs the public that it will sell to any person an oil and gas lease on any of the University lands; and to the end that a proper price may be had from a highest bid, requires that the prospective purchaser select the tract he wishes to buy. In order to receive the highest price for the lease, and to afford every person an equal opportunity to purchase, the Act requires that advertisement be made that on a certain fixed date an oil and gas lease on that tract will be awarded. The Legislature through its enactment offers the lease for sale. When the conditions and terms of the Act are fully met and complied with, a sale to the highest bidder results. Nothing remains to be done to make the sale. All that remains to be done is the ministerial duties of the Land Commissioner in the matter of ascertaining who is the highest bidder and issuing or executing the lease to him so sold to him under the provisions of the Act. His duties in this respect are plainly stated in the law. That each of these deductions is true and correct is easily verified by an analysis of the Act. In fact, simply quoting its provisions proves them.

Section 1 is general, and provides that oil and gas leases on all University land shall be subject to sale in accordance with the provisions of the Act.

Section 2 provides that "sales of oil and gas leases on the lands included herein shall be made by the Commissioner of the General Land Office not less than once each month, when there is *land* in demand, and at 10 o'clock a. m. *on the day fixed therefor.*" (Italics ours). Then this section sets forth the price and terms of the lease.

Section 3 provides:

"The Commissioner shall advertise the land and the time when the mineral lease will be subject to sale, except as elsewhere pro-

vided in the event of tie bids. If there should be no other sufficient means for giving the necessary publicity as *to what tracts* will be subject to lease and *the time* when applications may be delivered to the General Land Office, the commissioner shall have lists of such tracts printed for free distribution at the expense of the State, which expense shall be paid out of the appropriation for public printing. Such lists shall contain a brief designation *of the tracts subject to lease* and the terms upon which they may be leased *and the time when* applications therefor will be opened and filed in the General Land Office." (Italics ours).

Section 4 provides in part that "separate applications for *each tract* \* \* \* shall be delivered into the General Land Office on or before the day and hour on which the lease will be subject to sale. \* \* \* All envelopes so endorsed shall be securely kept by the commissioner or his chief clerk unopened until the date on which applications are to be opened and at said hour either or both of them shall begin to open the envelopes in the presence of such persons as may desire to be present. \* \* \* An application which includes *two or more tracts* \* \* \* shall be void. \* \* \* When an application shall have been filed and considered and the land found subject to lease, the lease shall be issued for a term not to exceed five years to the applicant that pays the most, if any sum, for the area in addition to the ten cents per acre and the stipulated royalty. \* \* \* A duplicate of the lease shall be kept on file in the General Land Office. All leases shall be forwarded by the Commissioner, with one dollar recording fee, to the proper county clerk, who shall record same and deliver the lease to the lessor or his agent. If two or more persons should offer the same price for the same area and the same should be the highest price offered, all shall be rejected and a date fixed within the discretion of the commissioner, but not more than fifteen days after rejection, when a lease on the land will be subject to sale as in the first instance; provided no lease shall be sold for a sum less than the tie bid without the tract having been duly advertised and offered for sale on a regular sale date. All sums paid upon rejected applications shall be returned by the State Treasurer."

The remaining eleven sections of the Act are not material to issues before us.

As first stated, the Act makes an offer to sell the leases. Like other similar Acts, it may be designated an "offer" law. The law stipulates the terms of the contract, and its provisions are subject

to the same or similar construction as the provisions of contracts between individuals.

Appellants' contention is that the bidder is the offerer, and the State the acceptor, and there is no contract until the bid or offer is accepted by the Commissioner of the General Land Office for the State.

The Attorney General quotes the following from Chapter 71 of the Acts of 1925:

"When an application shall have been filed *and considered* and the land found to be subject to lease, *a lease shall be issued* for a term not to exceed five years *to the applicant that pays the most,* if any sum, for the area in addition to the ten cents per acre and the stipulated royalty."

He then says:

"The balance of the act has no bearing, but this last sentence in itself determines the question at issue. When an application has not only been filed but also considered, then, and not until then, shall a lease be issued. Such lease is issued, not to all applicants, but, of course, only 'to the applicant that pays the most' under the plan of competitive bidding. It is with a view to determining the highest bidder that the applications must 'be considered' by the Land Commissioner or his Chief Clerk.

"It appears that none of the applications *were opened or examined,* and interveners do not even assert that they were the highest bidders—'the applicant that pays the most' as the Act phrases it—but simply claim that they became entitled to have their applications opened and to have ascertained whether their bids were the highest bids, and to purchase such lands in the event any of their bids were the highest bids, and that defendants would have acted accordingly but for the restraint of plaintiff's temporary injunction.

"It would seem that their interest under this law on January 2 depended upon an event that was uncertain—their ascertainment as the highest bidders. Their right then as such would be contingent, not vested, since it would come into existence only on an event that might not happen."

We cannot agree with this construction of the statute. The law has provided this method of making sales to highest bidders. In fact, it would appear the Legislature would be helpless and could not provide a method or means of selling to a highest bidder unless it could adopt this or some similar method.

It is clear that the duties of the Commissioner in these respects are purely ministerial. If any discretion whatever was reposed

in him as to whether or not he would open the bids and ascertain who was the highest bidder and issue the lease in accordance with law, the statute would be wholly ineffective to accomplish the legislative intent to make sales of leases for oil and gas on University lands. It would be a delegation of authority to the Commissioner to sell or not to sell such leases, and the whole Act would be void as a delegation of a power to the Commissioner that the Legislature itself must exercise. We understand that this is the construction put upon the Act by both respondents, the late Honorable J. T. Robison, then the Land Commissioner, and the Chief Clerk, Honorable J. H. Walker, who is now the Land Commissioner.

As we have shown, under the Act the Commissioner has nothing to do with the acceptance. His duties as fixed by the statute are not to contract as agent for the State. He has no power, discretion, or authority under the Act to accept or reject the bid of the highest bidder. But the statute makes it his duty to ascertain who is the highest bidder, and to execute a lease to him. No discretion, no power of rejection, is reposed in him. His duties are fixed by law, are mandatory and ministerial. Who is the highest bidder for a tract—who has a contract of purchase—is not "uncertain" as contended by appellants; only undetermined or undiscovered, and the statute provides the procedure for discovering or ascertaining who he is.

In the case of Jumbo Cattle Co. v. Bacon, 79 Texas, 5, this Court, speaking through Mr. Justice Gaines, says:

"When there is an offer made by an Act of the Legislature which is accepted by an individual, there is a contract, which is not within the power of the State to impair. After an acceptance, a repeal of the law can not affect the contract, but until an acceptance, a repeal of the Act withdraws the offer and no contract can be made."

This correct announcement of the law applies with full force to the case under consideration in regard to the land included in Schedule B. An Act of the Legislature made the offer, and interveners have accepted it as provided and conditioned in the Act. A contract between the State and the highest bidder was made. White v. Martin, 66 Texas, 340; Jumbo Cattle Co. v. Bacon, 79 Texas, 5; Standifer v. Wilson, 93 Texas, 232; Tatum v. Kincannon, 54 Texas Civ. App., 633, 119 S. W., 113. Nothing remained to be done to effect the making of the contract. The Act specifically provides the means of producing the evidence of the contract, i. e., it makes it the mandatory duty of the Commissioner to examine the

bid or bids, ascertain with whom the State has contracted under its offer and the acceptance thereof, and accordingly to execute the lease. The doing of the ministerial acts of opening the bids, ascertaining who is the highest bidder, and issuing the lease according to the terms of the law, is no part of the contract itself. It is only making effectual the contract already made. The acceptor of the State's offer can no more withdraw his money deposit and back out than can the Commissioner refuse to carry out the contract as the law requires of him. The contracts here are not within the power of the State to impair. The Repealing Act of 1929 cannot affect these contracts, but does withdraw the offer of further sales.

What we have said disposes of Question No. 2. If rights had attached on January 2d that could not be impaired by a repeal of Chapter 71 of the Acts of 1925, that result could not be accomplished by a postponement of the sale by the Commissioner, either by his voluntary act or by a court order. No authority can be exercised by the Commissioner of the General Land Office except such as is conferred on him by law. His acts in excess of powers conferred are not official acts, and it is not necessary that the exercise of powers be negatived in order to restrain the scope of their exercise.

The Act provides for the sale of oil and gas leases on University lands only "when there is land in demand." Therefore, if there was no demand for a tract of land as contemplated by the Act, no sale of a lease on such land was offered. The certificate of the Court of Civil Appeals sets out the following facts as to the demand on Schedule A land:

"During the summer and fall of 1928 and up to November 10, 1928, the Land Commissioner had many requests made of him by many persons that oil and gas leases of all University lands generally, be placed on sale under Chapter 71 of the Acts of 1925 (R. S., Art. 5343), which requests were determined by him to render such land 'in demand' as provided in said act, and the Land Commissioner, in good faith believed it to be his mandatory duty to place such oil and gas leases on sale."

This was entirely too indefinite and too general. *Many* requests by *many* persons that oil and gas leases on *all* of the University lands *generally* be placed on sale was no demand at all as could have been contemplated by the Legislature. Oil and gas leases on all University land were made subject to sale by the Act, but only such land

as was in demand was offered by Section 2 of the Act. The idea is negatived that the Legislature was offering *all* University land *generally*. Section 3 directed the Commissioner to give publicity "as to *what tracts*" were offered for lease and "have lists of *such tracts* printed," which "shall contain a brief designation *of the tracts* subject to lease."

As to Schedule B land the demand was sufficient. Under the agreed facts as set out by the certificate of the Court of Civil Appeals, about November 1, 1928, interveners Gibson, Johnson, and Renaud filed an application with the Land Commissioner asking that oil and gas leases be placed on sale on certain specified tracts of land. This application was followed by written requests to the same effect by the same parties during the months of November and December. Finally, of course, they filed their properly prepared and definite bids on each tract.

While the nature of the demand was not the issue, yet for its bearing generally on all the issues in this case we quote the following by this Court in the case of Theisen v. Robison, 117 Texas, at page 510, 8 S. W., (2d) at page 652:

"As we interpret the act, the land commissioner is mandatorily required to sell oil or gas in any University land upon receipt of a request to place same on sale. The land commissioner seems to have uniformly so administered the act, saying in his answer:

" 'In this connection respondent avers that he has construed that provision of the act as being mandatory wherein it is provided that said lands shall be sold "not less than once each month, when there is land in demand, and at ten o'clock a. m. on the day fixed therefor," as requiring the land commissioner to advertise for sale mineral leases on any of the University lands *whenever any one files an application with him asking that leases on certain lands be sold.* Respondent is of the opinion that he has no discretion in the matter, but whenever it is called to his attention in an affirmative manner that there is a demand for leases *on certain* land it is his duty to advertise the lease or leases for sale and to fix a time when the same shall be sold within not more than one month from the time he was informed that there was a demand for said leases.'

"Since land or minerals cannot be sold without a purchaser, and since the Legislature has determined that from and after the date the act of 1925 became effective the oil and gas *in any tract* for which there was an offer to purchase should be sold on specified terms, within 30 days, at 10 o'clock on the day set apart to conclude

a sale, the Legislature has completely fulfilled the constitutional requirement of prescribing when this mineral estate in the land shall be sold, and it was plainly competent for the act to empower the commissioner to make such regulations as the act authorized in its mere administration in order that the legislative will might be accomplished." (Italics ours).

Question No. 1 we answer, Yes.

Question No. 2 we answer, No.

Question No. 3 we answer, No.