## BOARD OF INSURANCE COM'RS v. TEXAS EMPLOYERS INS. ASS'N.

### No. 9497.

Court of Civil Appeals of Texas.   Austin.
June 27, 1945.

Rehearing Denied July 11, 1945.

48

Grover Sellers, Atty. Gen., Geo. W. Barcus, Eugene N. Catlett, J. A. Ellis, and Wm. J. R. King, Asst. Attys. Gen., and Thompson, Knight, Harris, Wright & Weisberg, of Dallas, for appellants.

Neth L. Leachman, of Dallas, and Charles L. Black, of Austin (Robertson, Leachman, Payne, Gardere & Lancaster, of Dallas, and Black, Graves & Stayton, of Austin, of counsel), for appellee.

BAUGH, Justice.

Suit by appellee against appellant to test the validity of an order of the Board of Insurance Commissioners, hereafter called the Board, dated October 18, 1944, on the alleged ground that the order exceeded the powers granted to said Board; and to enjoin its enforcement. Trial was to the court without a jury and after an extended hearing consuming some two weeks time, a temporary injunction was granted with certain limitations; from which judgment, the Board has appealed.

The order in question reads as follows:

"In order to prevent unfair discrimination between insurers or insureds and between insurers and insureds,· and in order that the Board of Insurance Commissioners may control Workmen's Compensation rates as is specifically required of it by law:

"It is therefore ordered:

. "1. That any agreement to waive, or attempt to waive, or any waiving of, directly or indirectly or any agreement to eliminate, or attempt to eliminate, or any elimination of, directly or indirectly, any portion of the surcharge premium under Retrospective Rating Plans B or C, is hereby prohibited on or in connection with any policy in effect on and after January 1, 1945.

"2. That the use of any so-called 'cost-plus' plan by endorsement or otherwise or any other type of plan or agreement, which affects, directly or indirectly, the premium cost to the insured employer, not approved by the Board of Insurance Commissioners, is hereby prohibited on or in connection with any policy in effect on and after January 1, 1945.

"3. That the use of any so-called 'stop-loss' plan or agreement or reinsurance, which, directly or indirectly, affects the premium of the insured employer is hereby prohibited on or in connection with any policy in effect on and after January 1, 1945.

"4. That all carriers writing Workmen's Compensation Insurance on a participating basis or plan, are hereby required to file with the Casualty Insurance Commissioner on or before January 1, 1945, its plan or proposed plan of determining and distributing dividends in complete detail, i.e.:

"a. A level rate of dividend plan.

"b. A 'sliding scale' dividend plan.

"c. Dividend plans by and for groups.

"d. Any other formula or plan.

"Each carrier so writing on a participating basis or plan is required to secure the approval of the Board of Insurance Commissioners of the use of its plan before such plan is used in the solicitation or writing of Workmen's Compensation Insurance or in any other manner. Each carrier desiring to pay dividends is required to file with the Board of Insurance Commissioners its application for authority to pay dividends based upon its plan. Each carrier is required to furnish to the Board of Insurance Commissioners such information concerning the proposed distribution of the dividends desired to be paid, as may be deemed necessary by the Board of Insurance Commissioners to enable the Board to pass upon whether such dividend payments are to be approved, and is required to secure the approval of the Board authorizing the payment of such dividends before the same are actually paid.

"5. That all participating provisions incorporated either in the policy, in endorsements, or in so-called 'plan of operation' endorsement now in use and heretofore approved by the Board of Insurance Commissioners, are hereby specifically withdrawn effective January 1, 1945.

"6. That all participating provisions either in the policy or endorsements to be used on or in connection with any policy in effect on and after January 1, 1945, must be approved by the Board of Insurance Commissioners, before it becomes effective.

"7. That the use of any plan, contract, agreement or resolution affecting the Workmen's Compensation policy contract as to rate, premium, classification, dividend or coverage not specifically approved and authorized by the Board of Insurance Commissioners, is hereby prohibited on or in connection with any policy in effect on and after January 1, 1945.

"8. That each insurance carrier writing Workmen's Compensation Insurance on a participating basis or plan, desiring to change its dividend plan or its method of determining dividends at any time subsequent to the dividend plan approved by the Board of Insurance Commissioners to be used on policies in effect on and after January 1, 1945, shall, before making any such change, submit such proposed dividend plan to the Board and secure approval of such plan before the same shall be used in the solicitation or writing of Workmen's Compensation Insurance or in any other manner.

"It is not intended by the Board of Insurance Commissioners in entering this Order to recognize the validity of any agreements which have been entered into between any insurance company and any insured employer, or which may be entered into in the future, not approved by the Board of Insurance Commissioners, which agreement or agreements may be illegal."

Paragraph 1 of said order was not attacked and its validity was upheld. Paragraphs 2 to 8, however, were held to be beyond the powers vested by law in the Board, Arts. 4907–4918a, R.C.S., as amended, Vernon's Ann.Civ.St. arts. 4907–4918a, and were set aside as void. However, the trial court limited the injunction granted as follows:

"The temporary injunction herein granted does not prohibit the Board of Insurance Commissioners from exercising its statutory powers to make and promulgate and enforce classifications of hazards and the rates of premium respectively applicable to each, a system of experience rating, from requiring adequate reserves before it approves an application for the payment of a sum out of savings or surplus for dividend distribution, as provided by Articles 4914 and section 23 of Article 8308, R.C.S. Texas 1925, nor from requiring sworn statements as authorized by Article 4910, R.C.S. Texas 1925, nor from requiring the filing of an annual statement as well as making examinations of plaintiff Association as authorized by section 16a of Article 8308, R.C.S. Texas 1925 [Vernon's Ann.Civ.St. art. 8308, § 16a]."

█ Limitations on the powers of the Board to control the operations of insurance carriers generally were stated by this court in Commercial Standard Insurance Co. v. Board of Insurance Commissioners, Tex.Civ.App., 34 S.W.2d 343, 345 (writ refused), as follows: "The board can exercise only the authority conferred upon it by law 'in clear and unmistakable terms, and will not be deemed to be given by implication, nor can it be extended by inference, but must be strictly construed.' 51 C.J. 56, State v. Robison [119 Tex. 302], 30 S.W.2d 292, 297." To the same effect is Humble Oil & Ref. Co. v. Railroad Commission, 133 Tex. 330, 128 S.W.2d 9; Board of Insurance Commissioners v. Guardian Life Ins. Co., 142 Tex. 630, 180 S.W.2d 906.

■ The Board relies, as the source of the power sought to be exercised in the order under attack, not only upon the Workmen's Compensation Law, V.A.C.S. Arts. 8306–8309a, as variously amended, and V.A.C.S. Arts. 4907 to 4918a, as amended; but also upon other statutes relating to the powers of the Board generally, and in relation to other types of insurance. However, because the statute itself has so minutely regulated workmen's compensation insurance, and because of the differences and distinctions between workmen's compensation and other types of insurance, the Legislature in Art. 4916, R.C.S., expressly provided "but the provisions of this Act (Workmen's Compensation) shall be construed and applied independently of any other law, or laws, or parts of laws, having to do with the matter of insurance rates or forms or of fixing the duties of the State Insurance Commission." The powers of the Board with regard to the order in question are therefore referable to the Workmen's Compensation Law; and must be found, if at all, within the provisions of that law.

■ It is also true that appellee association is itself created by that law and its powers and duties therein expressly defined. Its powers, therefore, being statutory and expressly granted by a part of the Workmen's Compensation Law, Art. 8308, R.C.S.1925, as amended, are in pari materia with the other provisions of that Law relating not only to compensation insurance but to the powers of the Board; and being so, the Board would have no authority to deny or limit the powers so given by law to appellee association, and any attempt to do so would be void.

■ Considering first paragraphs 4 to 8 of the order in question relating to dividends, as they affect appellee, and which furnish the chief ground of attack, a careful reading of these paragraphs manifests an effort of the Board to control dividends in complete detail in advance on the ground that distribution of such dividends may affect directly or indirectly the premium rate; and to forbid the writing of any compensation insurance by a participating company or association unless and until such a dividend plan has been submitted to and approved by the Board. And this, without setting forth in the order any standard by which the Board is to be guided in either approving or disapproving the conditions on which such company or association may be permitted to write workmen's compensation insurance.

Applicable statutes defining powers and duties of the Board are V.A.C.S. Arts. 4907-4918. Those defining the powers and duties of appellee association are the provisions of Art. 8308, V. A. C. S. The original Act which created appellee association, Acts 1913, Ch. 179, Reg. Session 33rd Leg., pt. 3, Sec. 17, provided that the association, subject to the approval of the Commissioner (now the Board), should initiate "Any proposed premium, assessment, dividend or distribution of subscribers," etc. That Act was amended in 1917, Chap. 103, Reg. Sess. 35th Leg., pt. 3, Sec. 16c, which made it the duty of the Board of Directors of appellee association to "determine hazards by classes, and fix the rates of premium which shall be applicable to the pay roll in each of such classes at the lowest possible rate consistent with the maintenance of solvency and the creation of adequate reserves and a reasonable surplus * * *." These two sections were repealed in the statute as rewritten in 1923, and it was made the duty of the Board of Insurance Commissioners, V.A.C.S. Art. 4907, to "make, establish and promulgate all classifications of hazards and rates of premiums respectively applicable to each * * *," by the standard prescribed in Art. 4911. Under this Article the Board must consider, among other things, the particular risks involved, maintenances of solvency, creation of adequate reserves and a reasonable surplus; such premium rate to "be fair and reasonable and not confiscatory as to any class of insurance carriers" authorized to do business in Texas. That is, whether corporate, stock companies, mutuals, reciprocals, and whether such policies be participating or non-participating policies. Arts. 4908 and 4913 require the Board to prescribe "standard policy forms" and "a uniform policy" and require all such insurance carriers to use it. Arts. 4909, 4910 require the Board to assemble the necessary data in the discharge of its duties and provide methods for securing such data. Art. 4915 gives the Board the power to make and enforce reasonable rules and regulations necessary to the discharge of the duties imposed upon it by the Act. Art. 4914 expressly recognizes the right of the types of insurers therein named to issue participating policies, but provides that dividends on such policies must first be approved by the Board; and

forbids approval by the Board of such dividends "until adequate reserve has been provided" by the company proposing to pay it. This obviously is to assure the continued solvency of such company and to see to it that such company or association meets the statutory requirement to "maintain reserves adequate to meet anticipated losses, carry all claims to maturity and policies to termination * * *." Art. 8308, Sec. 23.

Coming now to the statute which created appellee association, which defines its powers and duties, and under which alone it operates, Art. 8308, Secs. 13, 15 and 16 expressly authorize appellee association to distribute its subscribers (policy holders) into groups based upon "the experience of each such group as to premiums and losses" (not according to "hazards by classes," the standard prescribed by Art. 4911 by which the Board is to be guided in fixing the premium rates for such classes); to make assessments, if necessary, first within such group, if that group shows losses greater than the earned premium for such group (Sec. 15); "to rearrange any of the groups by withdrawing any subscriber and transferring him wholly or in part to any group and to set up new groups at its discretion" (Sec. 13); and Sec. 16 expressly provides that "Dividends and assessments shall be fixed by and for groups," but for the purpose of paying any claim against the association its entire assets are liable. In so far as appellee association is concerned, regulations of assessments are inapplicable for the reason that under Sec. 16a when the association accumulates a surplus of $200,000 or more, liability of its subscribers to assessment is suspended; and through efficient management and economic operation appellee has, as shown by the record, under the policy forms and premium rates prescribed by the Board, accumulated between 1936 and 1943, under the rules prescribed by the Board, a reserve of $548,000 and a surplus of approximately $2,500,000, besides returning to its subscribers as dividends since its creation, after payment of losses and costs of operation, savings amounting to more than $15,000,000.

The statutes above cited thus give to the appellee association express authority to group subscribers based upon premium (fixed by the Board) and loss experience, to determine and make assessments, where necessary, and to fix and pay dividends "by and for groups." No such power is expressly granted by law to the Board. While the Board is required to approve dividends proposed before they can be paid, the statute fixes the standard by which approval or disapproval of the Board must be made. That is (Art. 4914), such dividends must not reduce the association's reserve below what the Board deems adequate "to meet anticipated losses, carry all claims to maturity and policies to termination" (Sec. 23 Art. 8308). That is the extent of the Board's power in this regard; and the matter of grouping, declaration and payment of dividends, is by the statute itself vested in Board of directors of the association. It is also obvious that dividends cannot be guaranteed in advance nor made a part of the insurance contract. To do so would not only amount to an unauthorized reduction in advance of the premium rate fixed by the Board as necessary to cover losses and costs of operation of the insurance carrier, and thereby hazard the solvency of the company; but would undertake to determine at the beginning of the year that which necessarily cannot be determined until the end of the year. That is, whether or not, after deducting from the premium dollar paid the losses suffered during the year, costs of operation, and a reserve sufficient to "carry all claims to maturity and policies to termination," there then remains any portion of the premium dollar for return as dividends to the policy holder. Obviously the amount and payment, vel non, of such dividend is dependent in large measure upon reduction of losses, efficiency in management, and low operating costs, thus reducing to the subscriber or policy holder through such methods the ultimate costs to him of his insurance below that estimated by the Board and embodied in the premium rate fixed by it. While dividends are of necessity related to premiums and must be paid out of savings effected from the premium dollar paid; it does not necessarily follow that the premium rate fixed by the Board is referable to the savings made or dividends distributed by a particular company or association. Art. 4911 prescribes the standard for guidance of the Board in fixing the rates of premium, among other things, so as not to be "confiscatory as to any class of insurance carriers authorized by law to write workmen's compensation insurance in this State." The record discloses that such insurers include corporations organized for profit; stock compan-

ies which, though writing participating policies, pay dividends to their stockholders; mutuals; reciprocals; Lloyds, etc. Obviously a corporation which pays a part of its savings from premiums as dividends to its stockholders reduces by that much the amount of such savings from premiums which might otherwise be returned to policy holders as dividends; and, assuming the same efficiency of management, loss records, and operation costs, such a company cannot compete on equal terms, under the same premium rate, with an association which returns all of its savings from the premium dollar exclusively to its policy holders. The record affirmatively shows that appellee association, in addition to a complete inspection of its books and records by the examiners of the Board of Insurance Commissioners, has at all times furnished the Board full reports of all information contemplated in Art. 4910, or asked for by the Board as a basis for fixing rates; but that because of the fact that its operating expenses and loss ratio were so low the Board had not even considered its record in fixing premium rates; and that the Board had at one time refused to consider appellee's request, based upon its experience, to reduce the standard premium rate fixed by the Board.

It is not controverted that the order in question vitally affects appellee association, though not specifically named in the order. Appellant admits that it has no power to control the payment, within the rate prescribed by it, of dividends by appellee to the groups set up by the association; but insists that it can require of the association the information called for in the order and that same is necessary to prevent discrimination between groups and policy holders within groups in payment of dividends to them. However, a careful study of the order attacked shows that it not only requires certain information, but is prohibitory in character and designed to enable the Board to control in advance, before issuance of a policy, any "proposed plan of determining and distributing dividends in complete detail," notwithstanding such plan may have no bearing on the rate fixed by the Board; and without setting up any standard by which it is to be guided in approving or disapproving any plan submitted to it, thus assuming a potential arbitrary power.

Arts. 4909, 4910 prescribe the purposes for which the Board may "assemble data," "require sworn statements" from insurance carriers to enable it to exercise the powers granted to it by law, enumerated in the statute as "data for its use in establishing classifications of hazards and making and promulgating premium rates" and for obtaining other information which the Board may deem "necessary in determining proper classifications, rates and forms." The term "classifications" as therein used clearly relates to classification of hazards, a power given to the Board in Art. 4911, not to distribution into groups of policy holders based upon premium and loss experience, a power expressly granted to appellee association by Sec. 16 of Art. 8308. The information as to dividends required by the order, having no bearing either on the classifications of hazards, the premium rate to be fixed by the Board, nor the form of policy which the Board must prescribe; but relating only to a matter vested in the association by law, except in so far as such dividends may affect solvency and adequate reserves and surplus, the Board was without power to control it; and certainly without power to forbid, in effect, the association to do business unless the unauthorized information were furnished.

This conclusion is not in derogation of the authority of the Board to exercise the powers and duties conferred upon it by law to classify hazards, fix premium rates, prescribe policy forms, require insurers to maintain solvency, protect reserves and surplus, enforce generally the insurance laws of the State, and to secure all information authorized by law and necessary to that end. These powers are expressly recognized and preserved in the trial court's order. But under the guise of so doing, it is not authorized to invade internal affairs of an insurer, and deny to it the exercise of rights expressly given by law to such insurer; and which are not essential to the exercise by such Board of the powers granted to it.

Nor can Secs. 4–8 of the Order be sustained under the asserted power of the Board to prevent discrimination, if such existed, in the payment of dividends to or within groups. If the dividends distributed affected the premium rate, then power to control them could be asserted by the Board. But, as above stated, such is not the case. The power and duty to fix the rate is, under the law, the exclusive function of the Board. What can be saved to the policy holder by the insurer within that

premium rate, so long as the insurer meets all the requirements of the law, is essentially a function of management of the insurer. While efficient and economic management may increase such saving, and by returning it through dividends to the policy holder, reduce the ultimate cost to him of his insurance, the Board's power of control thereof in such a case would be by reducing the premium rate fixed by it—that is, the original cost to the policy holder—not by penalizing nor interfering with the amount nor distribution of savings made by an insurance carrier within the rate through efficient management in reducing losses and costs of operation. Since admittedly the Board cannot control the distribution of dividends, and so long as such distribution does not affect the premium rate, the solvency of the carrier, the adequacy of reserves and surplus, nor the ability of the carrier to pay all claims and carry its policies to termination, the Board has no power to prevent discrimination in dividend payments to policy holders, if such discrimination should exist; that being a matter which the policy holders themselves could prevent through appropriate action within the association or against its directors. See Texas Employers Ins. Ass'n v. Humble Oil & Ref. Co., Tex.Civ.App., 103 S.W.2d 818. And it may be noted that in the instant case none of the subscribers of appellee association, the ones who would be directly affected by such discrimination, if it existed, have ever complained of the methods used by the association in distributing dividends; nor have they asserted that they were discriminatory. We deem it unnecessary to set out and discuss here the detailed facts shown by the record which appellant asserts constitute discrimination between policy holders in distribution of dividends. To do so would unduly prolong this opinion to no useful purpose. Suffice it to say, if it were necessary to determine such matter, that mere distinctions and differences in the payment of dividends between groups or between policy holders within groups, based upon loss experiences within or between groups, does not in and of itself constitute unjust or unlawful discrimination within contemplation of the anti-discrimination laws, even if they were applicable to the facts relied upon by appellant as constituting discrimination.

█ Nor was the injunction improvidently granted, as urged by appellant, on the ground that it is purely an equitable proceeding, and that because of the discriminations alleged, even if it be granted that they were proven, which we do not find, appellee did not come into court with clean hands. The determinative issue in the case is whether the Board had the power, under the law, to issue the order under attack. Art. 4912, V.A.C.S., as amended by Acts 1943, 48 Leg., p. 614, Ch. 355, Sec. 1, expressly gives to any insurance company or association aggrieved by the promulgation of any "classification, rate or policy form" by the Board, the "right to apply to any Court of competent jurisdiction to obtain redress." While the order here under attack can scarcely be deemed either a classification, rate or policy; it is an official act of the Board vitally affecting the rights of appellee, the validity of which appellee had a right to attack, whether expressly given such authority by statute or not. Marrs v. Railroad Commission, 142 Tex. 293, 177 S.W.2d 941, 950; English Freight Co. v. Knox, Tex. Civ.App., 180 S.W.2d 633, 640. The fact that the relief sought was by injunction does not in itself necessarily determine the character of the action. Primarily the purpose of this suit was to test the validity of the order attacked, and the right to an injunction was dependent upon, and ancillary to, that main purpose. Consequently the unclean hands doctrine applicable to strictly equitable proceedings, does not here apply.

█ Paragraph 3 of said order is also invalid, we think, and was properly so held by the trial court, both on the ground that it is an attempt by the Board to forbid that which the statute expressly authorizes the association to do; and because too indefinite and uncertain to be enforceable, even if authorized. Appellant apparently takes the view, on which it seeks to sustain this paragraph of the order, that any plan which affects dividends necessarily affects premiums directly or indirectly. This contention we have disposed of above. Nowhere in the statutes defining the powers of the Board do we find any authority given either expressly or by clear implication to forbid or regulate reinsurance by the primary carrier. On the contrary, such authority is expressly given to the association in the 1923 amendment, now Art. 8308, Sec. 23, as follows: "and, for the protection of its reserves and surpluses against the liability herein imposed (the

association), shall have the same right to reinsure or be reinsured as casualty companies organized under General Laws." This amendment was enacted because the Attorney General of Texas had ruled that under the original act and the 1917 amendment, the association had no such power. It is to be noted also that there is no limitation made by the statute either as to the amount or character of such reinsurance the association may carry, with other companies. The record further shows that such practice had been followed by appellee association, with the approval of the Board, since 1923; and that as late as October 4, 1944, the Attorney General had advised the Board that the matter of reinsurance was purely one of contract between the original carrier and the reinsurer where deemed advisable by the original carrier to protect its reserves and surpluses. It is not controverted that as applied by appellee association it added nothing to the premium rate fixed by the Board but is paid for by the original carrier out of the premiums collected by it. It may also be said that it is a common practice followed in various types of insurance.

It is not clear from the language of paragraph 3 whether the Board used the terms " 'stop-loss' plan or agreement" and the word "reinsurance" as synonymous or not; nor what is meant by the term "stop-loss." Nor did the testimony of the actuary of the Board, who was its principal witness, clarify the matter. He testified that there are certain types of "pure" or "legal" reinsurance which are entirely legitimate and do not "affect the premium" and that "stop-loss plans differ in detail but in principle they are essentially the same." But we are left entirely at sea as to what types of "stop-loss" plans affect the premium, and what types do not, and no standard is either fixed or ascertainable whereby either the Board or the insurer may ascertain or determine that matter. Clearly, therefore, the prohibiting order is too indefinite and uncertain to be enforceable. It is obvious and conclusive, we think, that any reinsurance is in effect a stop-loss plan, so far as the original carrier is concerned. While the original carrier is, of course, liable upon his contract for all losses sustained thereunder, when by reinsurance contract or agreement he passes on to another insurer a part of the risk, or the loss, over and above a fixed amount; and should such excess loss occur and have to be paid by him, he

is reimbursed by the reinsurer to the extent of such excess liability assumed by the reinsurer. Hence the loss of the original carrier is necessarily stopped at the point, or in the sum, beyond which the reinsurer assumes the risk and agrees to pay it. It follows that reinsurance is in the very nature of things "stop-loss" insurance and being expressly authorized by statute for the protection of the original carrier's surplus and reserve, the Board was without authority to forbid it on the theory that dividends must be paid out of surplus, which in turn result from savings out of the premium dollar, may indirectly affect the premium. Even if it be conceded that the premium were so indirectly affected, such effect would be a matter which the Board should take into consideration in fixing in advance the premium rate; and gives no authority to the Board to interfere with the legally authorized manner in which such insurer conducts its business under and within the classifications made, premiums fixed and policies prescribed by the Board.

Considering now in inverse order paragraph 2 of said order, it seems that whatever the term "so-called 'cost plus' plan" may mean, under the attempted explanation made of it by appellant's evidence, the appellee association would not be affected by it because it does not now issue any such policies as might be deemed by the Board a cost-plus plan. However, as we understand it, prior to the time that appellee had accumulated such a reserve and surplus that it cannot under Art. 8303, Sec. 16a, issue an assessment policy, such association did make such contracts as came within the provisions of the order as interpreted by appellant; and might desire to do so again. Consequently appellee probably had such an interest as to authorize it to also attack this paragraph of the order. We shall therefore consider it.

■ Obviously the order nowhere undertakes to define what is meant either by "so-called" or any cost-plus plan, the use of which it prohibits. It may be that such terms have a technical meaning familiar to insurance experts, but the record fails to make clear any such meaning. As we understand it, appellant insists that two methods or plans of operation resorted to in the past constituted "cost-plus," whereby the employer or policy holder paid to the insurer its operating costs out of a fixed percentage of the premium dollar, the remaining portion of the premium

being applied to payment of losses. If all of the premium dollar were necessary to pay costs and losses, the subscriber got no return. If the costs and losses were less than the 100% of the premium, then the subscriber received the difference in dividends. However, as authorized by law and commonly practiced, the original insurer took out reinsurance with another company against catastrophe or excess losses above an agreed amount, which lesser sum was carried solely by the original insurer. Whatever, if any, losses which the original carrier was compelled to pay, in excess of the amount carried by it solely and not reinsured, were paid back to it by the reinsurer. For its own protection, and in addition to the premium received by it for reinsurance, the reinsurer entered into a separate contract of indemnity with the policy holder, whereby the insured policy holder agreed to reimburse the reinsurer for all sums it might be compelled to pay to the original insurer under the reinsurance contract. If we understand appellant's contention correctly, it is that this method makes the insurer bear merely the costs of operation, passes all losses to the policy holder, and in effect makes him a self insurer. That is, that ultimately the premium to be paid is based upon losses and expenses, and not that fixed by the Board. This same contention was made and determined adversely to appellant by the Circuit Court of Appeals in Gomillion v. Union Bridge & Construction Co., 5 Cir., 100 F.2d 937, wherein such an arrangement was held to be legal. Obviously the original carrier is not a party to the indemnity contract between the employer and the reinsurer; nor can such an agreement in anywise alter the original policy, the premium fixed therefor, nor the primary liability of the insurer thereunder. The losses payable are fixed by the Workmen's Compensation Law, and reinsurance of the risk by the original carrier authorized by that law. The cost of such reinsurance is included in the premium rate fixed by the Board; and whatever independent agreement may be made between the reinsurer and the insured employer cannot change either the rate fixed nor the policy prescribed by the Board. Consequently the Board would have no authority to forbid it.

Under the conclusion reached that the real issue involved herein is the validity of the order, and the authority of the Board under the law to issue it; that the

injunction is merely dependent upon that issue and ancillary thereto; and having concluded that the Board had no lawful authority to do so, the contentions of appellant that appellee failed to show irreparable injury unless such injunction were granted; and that greater harm would result to the public therefrom than to appellee, become immaterial and need not be discussed.

We have not undertaken to review herein the voluminous evidence contained in the record, nor to discuss at length, nor in the order presented, all of the contentions made by appellant; but have undertaken to discuss what we consider the controlling questions determinative of the appeal. From the conclusions reached, it follows that the judgment of the trial court should be affirmed and it is so ordered.